**UNITED STATES of America**

v.

**Carluin SANCHEZ, Defendant.**

**No. 91 CR 90 (JSM).**

United States District Court,
S.D. New York.

Feb. 10, 1993.

Sharon Davies, Asst. U.S. Atty., S.D.N.Y., New York City, for U.S.

David Cooper, New York City, for defendant.

## OPINION

MARTIN, District Judge:

I can think of few things more threatening to the liberty of our citizens than to have a court system which tolerates perjury by Government agents in a criminal trial. This is the second case in a brief judicial career in which I have found, on the basis of my assessment of the credibility of the witnesses who appeared before me, that police officers have lied in an attempt to secure the conviction of individuals whom they no doubt believe guilty of some criminal act.

The issue is particularly frustrating in the matter currently before the Court since it appears that my earlier failure to articulate clearly the bases of my decision in this case has led the Court of Appeals to express a view on the facts, without having seen the witnesses, that is directly contrary to the conclusion I reached having observed the witnesses. In addition, the Court of Appeals has directed that I enter judgment on the jury verdict, even though it expressly noted that I had not decided whether the conduct at issue amounted to knowing use of perjured testimony by the prosecution and the record indicated that alternative grounds urged for setting aside the jury verdict had not been decided because a new trial had been ordered pursuant to Rule 33.

Since this case will go back to the Court of Appeals and could conceivably be reviewed by the Supreme Court, it seems appropriate to set forth detailed factual findings as well as my conclusions as to the outstanding legal issues.

The strongest evidence against Carluin Sanchez was testimony by three police officers that in the course of executing a search warrant for the second floor apartment at 417 Thieriot Avenue in the Bronx they observed Carluin Sanchez running from the bedroom area to the bathroom

area of the apartment and that shortly thereafter they found bags of heroin floating in the toilet and in the toilet trap.

According to Sergeant Bushrod and Detective Domenitz, the two officers called as part of the Government's direct case, after breaking through the main entrance door to the building they proceeded up to the second floor landing. There Sergeant Bushrod knocked on the door, which was opened by Hector Sanchez, a/k/a Tito. Sanchez asked "What do you want?" When Bushrod identified himself as a police officer, Sanchez attempted to slam the door shut. According to his testimony, Bushrod prevented this by sticking his foot in the door. Both Bushrod and Domenitz testified that, in the ensuing struggle to push their way into the apartment, the door always remained partially open. Eventually Detective Chin, who had the ram, came up and joined the fray, striking the open door with the ram to help them gain entrance.

Both Bushrod and Domenitz testified that they observed Carluin Sanchez running from the bedroom to the bathroom as they struggled to push open the apartment door. When asked how many times Carluin Sanchez was observed running to the bathroom, Sergeant Bushrod answered "Once." (Trial 275). Detective Domenitz testified consistently with Sergeant Bushrod that he saw Carluin Sanchez run from the bedroom to the bathroom "initially when the door was open. It was open I guess about a foot maybe a little more. I saw a second male running from what turned out to be the bedroom into the bathroom." (Tr. 399–400, A 205–206).

The testimony of both Sergeant Bushrod and Detective Domenitz indicated that this sighting of Carluin Sanchez running toward the bathroom occurred prior to the time Detective Chin was summoned to hit the door with the ram to assist them in gaining entrance.

The defense called the owner of the building in question, a young police officer named John Valdespino, who had no official involvement with this investigation. He produced photographs that clearly indi-

cated that the ram had been applied to a locked door, not the open door to which Domenitz and Bushrod testified.

In rebuttal, the Government called Detective Daniel Chin. Contrary to Bushrod's and Domenitz' testimony that once Tito Sanchez opened the door there was a constant struggle with the door always partially open, Detective Chin testified that when he got to the top of the stairs, the door was closed and Bushrod was standing away from it. Adopting the party line, however, Chin testified that once he used the ram to open the door there was a struggle, and he too observed Carluin Sanchez running from the bedroom to the bathroom. At the motion to suppress hearing held subsequent to the remand from the Court of Appeals, another police officer, Lieutenant Comperato, testified. Although he indicated that he was further down on the stairway and could not see what happened inside the apartment, he testified that Sergeant Bushrod had his foot in the door prior to the time Detective Chin was called up to hit the door with the ram and Bushrod and Domenitz were struggling at the door as Chin passed him on the way up.

Based on my observations of the witnesses who testified before me, I find as a fact that police officers committed perjury at this trial concerning the way they obtained entry to the apartment and their observations of Carluin Sanchez running towards the bathroom. This conclusion which exists to a moral certainty is based on their demeanor as well as the inconsistencies and contradictions of their testimony. Having spent a substantial part of my professional life in law enforcement, it does not come easy for me to reach that conclusion. But no reasonable person who observed Sergeant Bushrod's testimony could reach any other conclusion.

Having observed Sergeant Bushrod testify, it was clear to me that he was a person with no respect for the truth. A cold record cannot capture the impression made by Sergeant Bushrod, particularly on cross-examination where it became evident that the truth was not as important to him as

giving an answer damaging to the defendant.

The testimony of Detective Domenitz was also not credible and was contradicted by the objective evidence that the door had been closed and locked when it was hit by the ram, as well as by the testimony of Detective Chin.

Chin's testimony was not credible in light of all the other evidence, including contradictions not only with Bushrod and Domenitz, but also to some extent with Comperato. Thus, it is impossible for this factfinder to find, even on a preponderance of the evidence standard, that Chin observed what he testified he observed.

I find that the following occurred at 417 Thieriot Avenue on the morning of January 9, 1991.

A group of police officers arrived with warrants to search the second floor apartment and the basement, but not the first floor apartment at that address. Detective Chin used the ram to break into the front door and Sergeant Bushrod led a group of police up to the second floor apartment.[1] As Detective Chin was placing the ram down after battering the front door, he was called to the upstairs apartment where Sergeant Bushrod was standing in front of a locked and closed door. Detective Chin was told to break in the door before anyone knocked and announced their purpose.

While Tito Sanchez is a witness of questionable credibility, his testimony that the police entered the apartment unannounced without a struggle at the door more probably comports with what occurred than does the police testimony concerning a struggle at the door—which would place three of the officers on a small landing in a position to observe Carluin Sanchez running towards the bathroom. One of the benefits of observing the witnesses is that it becomes obvious that a small man like Tito Sanchez—even with his pre-prison food girth—would not have been able to prevent three good sized men like Domenitz, Bushrod and Chin from quickly pushing their way into the apartment. Certainly he could not have delayed them long enough for Carluin Sanchez to get into the bathroom, dump the heroin in the toilet, flush it and emerge.

In addition, as noted earlier, the testimony of the four police officers is totally inconsistent. Bushrod's and Domenitz' testimony was that they saw Carluin Sanchez running to the bathroom once and that this was before Chin was called up with the ram. Thus, if Bushrod and Domenitz are to be believed it would have been impossible for Chin to have observed Carluin Sanchez running towards the bathroom after the door was struck with the ram. Despite Chin's unequivocal testimony that Bushrod was standing away from the door when he came up the stairs, both Bushrod and Domenitz testified that the door was always partially open as they struggled to gain access and Lieutenant Comperato testified that Bushrod and Domenitz were pushing against the door when Chin came up the stairs and passed him. Further, at the argument on the motion to suppress, the United States Attorney persuasively argued that Tito Sanchez would have been anxious to keep the police officers from entering his apartment. This is totally inconsistent with the idea that Tito would have opened the door to ask the police what they wanted when he already knew they were coming, thereby giving them the opportunity to push their way into the apartment. Yet Sergeant Bushrod swore Tito Sanchez opened the door and said "What do you want?"

While I find that the police officers did not knock and announce their purpose and that no one saw Carluin Sanchez running into the bathroom, Tito Sanchez admitted that he knew the police were on their way and was not about to let them into the apartment.

---

1. At the same time, other police officers broke into the first floor apartment for which they did not have a search warrant. Lieutenant Comperato attempted to justify this warrantless entry into an apartment for which the police had no search warrant by claiming the door was open. This testimony is contradicted by that of Officer Valdespino that he firmly closed the door and braced it shut.

Having found that the testimony of the police officers that they knocked and announced their purpose was false, as was their testimony that they observed Carluin Sanchez running to the bathroom before they entered the apartment, the issue arises whether Carluin Sanchez' conviction can be set aside. As noted at the outset, at the time I originally granted the motion for a new trial because I had concluded that the perjury by the police officers justified a new trial in the interest of justice, there had been no decision as to other possible grounds for granting a new trial. As the Court of Appeals noted in its decision, I had not decided whether the perjury committed by the police officers involved in the prosecution could be considered as the knowing use of perjured testimony by the Government even though the prosecutors were unaware of the perjury. In addition, at the trial, defense counsel indicated an intention to move, as part of his new trial motion, to suppress the evidence found in the apartment on the basis of the proof at trial that indicated that the agents had failed to knock and announce their purpose. This application was deferred at my suggestion.

The Court of Appeals did not consider the question whether testimony by police officers closely associated with the prosecution could be considered knowing use of perjured testimony by the prosecution, even though the Assistant United States Attorneys prosecuting the case were totally unaware of the perjury. Since I have found as a fact that there was perjury by

police officers closely associated with the prosecution,[2] that issue must be addressed.

In reversing this Court's prior decision to grant a new trial, the Court of Appeals indicated that it did so "because it could not be said that the jury would have acquitted in the absence of the false testimony." As the Court of Appeals itself noted, however, this is a different standard than that which applies to cases where the prosecution knowingly used false testimony. In such cases, the courts "apply a less stringent test and permit the granting of a new trial where the jury 'might' have acquitted absent the perjury." *Sanchez*, 969 F.2d at 1414.

The Court of Appeals recently restated the standard for granting a motion for a new trial based on the introduction of perjured testimony:

Whether the introduction of perjured testimony requires a new trial depends on the materiality of the perjury to the jury's verdict and the extent to which the prosecution was aware of the perjury. With respect to the latter inquiry, there are two discrete standards of review that are utilized. Where the prosecution knew or should have known of the perjury, the conviction must be set aside " 'if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.' " *Perkins v. LeFevre*, 691 F.2d 616, 619 (2d Cir.1982) (quoting *United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976)); *see also Sanders v. Sullivan*, 863 F.2d 218, 225 (2d Cir.1988)

**2.** Although the Circuit Court stated, "[I]t appears to us that the district judge erred in discounting the testimony of Sergeant Bushrod and Detectives Domenitz and Chin as perjured," that statement is *dictum* since the Circuit Court concluded "assuming that the testimony of all three police officers should be rejected in toto as perjury, a new trial would not be warranted...." *United States v. Sanchez*, 969 F.2d 1409, 1414–15 (2d Cir.1992). Thus, while the Circuit's statement may be viewed as a comment on the weakness of some of this Court's reasoning it cannot be considered as supplanting this Court's function of assessing the credibility of witnesses whose demeanor has been observed only by the District Judge. It is well settled that "[i]f the district court's account of

the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). This is especially so where determinations of credibility are at issue, "for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." 470 U.S. at 575, 105 S.Ct. at 1512.

(question is whether the jury's verdict "might" be altered); *Annunziato v. Manson,* 566 F.2d 410, 414 (2d Cir.1977). Indeed, if it is established that the government knowingly permitted the introduction of false testimony reversal is "virtually automatic." *United States v. Stofsky,* 527 F.2d 237, 243 (2d Cir.1975) (citing *Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959)), *cert. denied,* 429 U.S. 819, 97 S.Ct. 66, 50 L.Ed.2d 80 (1976). Where the government was unaware of a witness' perjury, however, a new trial is warranted only if the testimony was material and "the court [is left] with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted." *Sanders,* 863 F.2d at 226; *see also United States v. Seijo,* 514 F.2d 1357, 1364 (2d Cir.1975). *United States v. Wallach,* 935 F.2d 445, 456 (2d Cir.1991).

There is no reason to believe that the prosecuting attorney had knowledge of the perjured testimony. Rather, the issue is whether intentional perjury by law enforcement officers closely associated with the prosecution constitutes the "knowing use of perjured testimony by the prosecution" so that the conviction must be set aside "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury."

■ The Court of Appeals in this Circuit has never addressed this issue. But the Supreme Court has indicated that perjured testimony coerced by local law enforcement authorities is so reprehensible as to establish a due process violation. *Pyle v. Kansas,* 317 U.S. 213, 215–16, 63 S.Ct. 177, 178–79, 87 L.Ed. 214 (1942); *Mooney v. Holohan,* 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935).[3] Other courts which have considered the question more recently have persuasively found that perjury by, or suborned by, a government agent involved in

the case was fairly characterized as knowing use of perjured testimony by the prosecution.

"If the state through its law enforcement agents suborns perjury for use at the trial, a constitutional due process claim would not be defeated merely because the prosecuting attorney was not personally aware of this prosecutorial activity." *Schneider v. Estelle,* 552 F.2d 593, 595 (5th Cir.1977). There, a University of Texas campus police officer was alleged to have committed perjury in claiming that the defendant had used a gun to rob him. Holding that the officer was "a member of the prosecution team," *id.,* the court found that the alleged perjury would have been a denial of due process rights and remanded the case for an evidentiary hearing.

Where a Drug Enforcement Agency agent failed to correct a witness' false testimony that no promises or agreements existed between the witness and the government, and then while testifying himself affirmatively misrepresented that no promises or agreements existed, a new trial on the grounds of prosecutorial misconduct was ordered. *United States v. Turner,* 490 F.Supp. 583, 610 (E.D.Mich.1979), *aff'd,* 633 F.2d 219 (6th Cir.1980), *cert. denied,* 450 U.S. 912, 101 S.Ct. 1351, 67 L.Ed.2d 336 (1981). While no knowledge of the perjury by the prosecuting attorney was claimed, the court noted that the agent was not one "who had only ancillary contact with the case." 490 F.Supp. at 606.

In *Smith v. Florida,* 410 F.2d 1349 (5th Cir.1969), a prosecutor's lack of knowledge of perjury was held to be no bar to establishing a due process violation where the perjury was induced by local law enforcement officials. Similarly, the Eleventh Circuit has recently affirmed that a new trial would be required if a government agent involved in the case were found to have committed perjury. *United States v. Espi-*

---

**3.** Although the issue here is raised in the context of a Rule 33 motion for a new trial "in the interest of justice," case law establishing that perjured testimony by government officials rises to the level of a due process violation is clearly on point. It would be absurd to assert that

conduct which rises to the level of a constitutional due process violation sufficient to overturn a conviction in a *habeas corpus* proceeding does not likewise mandate a new trial "in the interest of justice."

*nosa–Hernandez,* 918 F.2d 911, 914 (11th Cir.1990); *see also Curran v. Delaware,* 259 F.2d 707, 713 (3d Cir.1958), *cert. denied,* 358 U.S. 948, 79 S.Ct. 355, 3 L.Ed.2d 353 (1959); 3 Wright, Fed.Prac. & Proc. 341–43 (2d ed. 1982) ("It is established that due process has been denied if a conviction is obtained through use of false evidence, known to be such by *representatives* of the prosecution") (emphasis added) (citing cases).

That knowing perjury by a federal agent who is involved in the prosecution can constitute "knowing use by the prosecution" is supported by case law in this Circuit regarding *Brady* disclosure requirements. In *United States v. Morell,* 524 F.2d 550 (2d Cir.1975), significant information regarding an informant witness' credibility and bias was not disclosed to the defense. While the United States Attorney's Office had no knowledge of the information, a government law enforcement agent who supervised the informant did. The agent was not only the supervisor for the informant, who was a key witness, but also "participated actively in [the] investigation" and "was present at [the prosecution]'s table throughout all or most of the trial, indicating that he was intimately involved in the prosecution." *Id.* at 555. The court held that "[w]hile the prosecutor cannot be charged with the failure to produce information in the possession of any government official, in this case it seems fair to view [the agent] as an arm of the prosecutor." *Id.*

■ In a subsequent case, the Second Circuit distinguished government officials who may be treated as an "arm of the prosecutor" from those who may not. The court held in *Pina v. Henderson,* 752 F.2d 47 (2d Cir.1985), that a parole officer who "did not work in conjunction with either the police or the prosecutor" was not sufficiently linked with the prosecution so as to impute the officer's knowledge to it. *Id.* at 49; *accord United States v. Stassi,* 544 F.2d 579, 582 (2d Cir.1976), *cert. denied,* 430 U.S. 907, 97 S.Ct. 1176, 1177, 51 L.Ed.2d 582 (1977) (same); *Stofsky,* 527 F.2d at 244 n. 7 (knowledge of Internal Revenue Service from tax return of witness not imputed to prosecution). However, the *Pina* court let stand the district judge's finding that a police officer who "did testify in [the] trial and was the investigating officer," 586 F.Supp. 1452, 1457 (E.D.N.Y.1984), was an "arm of the prosecution" whose knowledge was to be attributed to the prosecution. 752 F.2d at 50. Thus, while not every government employee's knowledge is imputable to the prosecution for *Brady* purposes, where a government agent is involved in the investigation or prosecution of the offense, his or her knowledge is to be imputed to the prosecution.[4]

■ Whether knowledge is to be imputed from a government agent to the prosecution for *Brady* purposes is instructive in determining whether knowing perjury by a government agent should be considered "knowing use" by the prosecution. Cases establishing the latter proposition have often relied on case law developed to address the former. *See, e.g., Espinosa–Hernandez,* 918 F.2d at 913–14; *Schneider,* 552 F.2d at 595; *Smith,* 410 F.2d at 1350–51; *Turner,* 490 F.Supp. at 608–10. Furthermore, considerations are similar in both contexts, as shown by the reasoning of the *Brady* cases: "It makes no difference if the withholding is by officials other than the prosecutor. The police are also part of the prosecution, and the taint on the trial is no less if they, rather than the State's Attorney, were guilty of the nondisclosure." *Barbee v. Warden,* 331 F.2d 842, 846 (4th Cir.1964). And where cases involve both nondisclosure and perjury, courts consider them jointly under the ru-

---

4. It is not clear that even this distinction is necessary or justified where perjury, as opposed to non-disclosure, is concerned. The policy behind not imputing the knowledge of every government employee to a prosecution is clear. It is far less clear that perjury by a government agent, testifying as a representative of the government, is not an error of constitutional magnitude, regardless of his or her level of involvement with the prosecution. Nonetheless, because the government agents in this case were in fact involved with the investigation of the case, it is not necessary to reach the propriety of this distinction in the context of perjury.

bric of "prosecutorial misconduct". *See, e.g., United States v. Butler*, 567 F.2d 885 (9th Cir.1978). In fact, the argument to charge the prosecution with knowledge of a government agent's perjury is even stronger than the argument to impute knowledge of *Brady* material. While the prosecution's failure to disclose relevant information might be due to a negligent lack of communication, perjury by a government agent can only be a knowing, intentional decision to lie by a member of the institution which is charged to uphold the law and seek just convictions. Therefore, it is a short step indeed to apply case law regarding *Brady* obligations to instances of perjury.

Here, Bushrod and the others were clearly part of the federal prosecution team. They were assigned to the New York Drug Enforcement Task Force, a joint city-state-federal task force that was responsible for investigating the narcotics conspiracy in which Tito Sanchez was involved. They were deputized as federal agents and at the time of the search and arrests at issue they were executing federal warrants. Agent O'Grady, one of the members of that task force, actively assisted the prosecutors at this trial. Thus, these police officers were clearly members of "the prosecution team", *Schneider*, 552 F.2d at 595, and their perjury is the knowing use of perjury by the prosecution, even though the Assistant United States Attorney was unaware of the perjury. Thus, a new trial should be ordered here if "the jury might have acquitted absent the perjury." *Sanchez*, 969 F.2d at 1414.

■ There can be no question in this case that the jury might have acquitted Carluin Sanchez absent the perjurious testimony of the police officers. The only other testimony implicating Carluin Sanchez came from Carlos Trinidad, an accomplice whose testimony was as the Court of Appeals noted "impeached by evidence of seri-ous drug abuse, auditory hallucinations, inconsistent statements and the hope of reward for cooperation...." On the basis of my observations of his testimony at the trial of Carluin Sanchez, it is apparent that no reasonable jury would base a finding of guilt beyond a reasonable doubt on his testimony.

Since the Court has concluded that there was perjured testimony by police officers intimately involved in this case which constitutes the knowing use of perjury by the Government and that the jury might, and I believe would, have reached a different result · absent that perjured testimony, the applicable law in this Circuit compels the conclusion that Carluin Sanchez should be granted a new trial, but given the Court of Appeals mandate I am powerless to do so.

*Motion to Suppress*

Carluin Sanchez did not move prior to trial to suppress the evidence found during the search of the apartment at 417 Thieriot Avenue. Sanchez's counsel has represented to the Court that prior to trial he could not make such a motion because he did not have a person available to sign an affidavit that the arresting officers did not knock and announce their purpose prior to breaking into the apartment. Although Tito Sanchez had told his brother's lawyer that the agents had failed to knock and announce their purpose, he did not plead guilty until after the trial of Carluin Sanchez and was obviously unwilling to sign an affidavit and testify at a suppression hearing prior to his brother's trial. Counsel for Carluin Sanchez has also repeatedly represented that Carluin Sanchez was asleep at the time the agents arrived at the apartment and thus was unable to provide an affidavit that they failed to knock and announce their purpose. This was confirmed by the testimony of Tito Sanchez at the post-trial hearing on the motion to suppress that his brother was asleep at the time the agents arrived.[5]

---

**5.** Although the Court accepts the representation of defense counsel concerning his client's statements that he was asleep at the time the agents arrived, the Government has questioned the failure of Carluin Sanchez to submit such an affida-vit. To complete the record, Carluin Sanchez should submit such an affidavit by the day of sentence and the Court will permit the Government's counsel to cross-examine him on that affidavit if the Government notifies the Court

Defense counsel first raised the suppression issue at trial after Officer Valdespino testified as a defense witness and authenticated photographs of the apartment door which clearly contradicted the testimony of Bushrod and Domenitz that the door was open when it was struck by the ram. At the Court's suggestion, this issue was deferred at that time and again deferred by the Court when defense counsel raised it during the discussion of the original new trial motion.

■ The timing of motions to suppress is governed by Fed.R.Crim.Proc. 12, which provides in pertinent part:

(b) Pretrial Motions. Any defense, objection, or request which is capable of determination without the trial of the general issue may be raised before the trial by motion.... The following must be raised prior to trial:

.    .    .    .    .

(3) Motions to suppress evidence;

.    .    .    .    .

(f) Effect of Failure to Raise Defenses or Objections. Failure by a party to raise defenses or objections or to make requests which must be made prior to trial ... shall constitute waiver thereof, but the court for cause shown may grant relief from the waiver.

The provisions of Rule 12(f) apply to a motion to suppress evidence. *Davis v. United States*, 411 U.S. 233, 242, 93 S.Ct. 1577, 1582, 36 L.Ed.2d 216 (1973); *United States v. Ulloa*, 882 F.2d 41, 43 (2d Cir. 1989); *Indiviglio v. United States*, 612 F.2d 624, 630 (2d Cir.1979), *cert. denied*, 445 U.S. 933, 100 S.Ct. 1326, 63 L.Ed.2d 768 (1980). Thus, "absent good cause, the failure to challenge a search warrant before pleading ordinarily bars any consideration of the merits of such a challenge." *United States v. Brahms*, 746 F.Supp. 385, 386 (S.D.N.Y.1990), *aff'd*, 932 F.2d 955 (2d Cir.), *cert. denied*, — U.S. —, 112 S.Ct. 439,

116 L.Ed.2d 458 (1991); *see Ulloa*, 882 F.2d at 43.

■ Whether or not to grant relief from the 12(f) waiver "for cause" is a determination within the discretion of the district judge. *Jones v. United States*, 362 U.S. 257, 264, 80 S.Ct. 725, 732, 4 L.Ed.2d 697 (1960); *United States v. Rodriguez*, 738 F.2d 13, 16 (1st Cir.1984); *United States v. Harrelson*, 705 F.2d 733, 738 (5th Cir.1983); *United States v. Wertz*, 625 F.2d 1128 (4th Cir.), *cert. denied*, 449 U.S. 904, 101 S.Ct. 278, 66 L.Ed.2d 136 (1980).

■■ While no definition of "cause" is provided in the Federal Rules of Criminal Procedure or the accompanying notes from the Advisory Committee, it is clear that where the grounds for the motion are not discoverable by the defendant until after the trial has begun, cause is established. *See Indiviglio*, 612 F.2d at 631. "In the interest of normal procedural orderliness, a motion to suppress, under Rule 41(e), must be made prior to trial *if the defendant then has knowledge of the grounds on which to base the motion.*" *Jones*, 362 U.S. at 264, 80 S.Ct. at 732 (emphasis added).[6]

■ In *United States v. Jones*, 766 F.2d 994, 999 (6th Cir.), *cert. denied*, 474 U.S. 1006, 106 S.Ct. 526, 88 L.Ed.2d 458 (1985) (a case unrelated to that reported at 362 U.S. 257, 80 S.Ct. 725), a failure to challenge an indictment prior to trial was excused on the basis that appellants were "unaware of the grounds for this motion until [a government agent] was called as a witness at trial." *Accord United States v. Oldfield*, 859 F.2d 392, 397 (6th Cir.1988). Likewise, where a defendant could not challenge an indictment because he had not received a copy of grand jury testimony until the trial began, relief from the waiver was granted for cause. *United States v. Cathey*, 591 F.2d 268 (5th Cir.1979).

While "cause" may be established by a showing that the basis for the motion did not exist prior to trial, it is not limited to

and counsel of its intent to do so at least one week before the date of sentencing.

**6.** Motions made under Rule 41(e) for the return of illegally seized evidence are treated as motions to suppress if made after an indictment or information is filed, and are subject to Rule 12 constraints.

**250**

that situation. This Court has found that a defendant had a "colorable argument for good cause" for failing to move to suppress prior to trial when a search warrant was allegedly issued based on information obtained from the defendant's attorney in violation of the attorney-client privilege, and the defendant was allegedly prevented from challenging the warrant by threats of violence from the attorney. *Brahms,* 746 F.Supp. at 386 (Tenney, J.).

While here defense counsel was aware prior to trial that grounds existed for a suppression motion, he did not have available an affiant or witness who could testify that the officers did not knock and announce their purpose. Since Government counsel had represented at a bail hearing that the officers would testify that they knocked and spoke to Tito Sanchez before entering the apartment (See Transcript of July 9, 1991, p. 70), it would have been fruitless for defense counsel to have made a suppression motion without a supporting witness. It was only after Bushrod and Domenitz testified at trial and described the entire circumstances of how they obtained entry to the apartment that the photographic evidence gained sufficient significance to call into question the prior representation of Government counsel.

It would hardly be an efficient use of court resources to require defense lawyers to make motions prior to trial without a sufficient basis merely in order to preserve the timeliness of such motions. The Supreme Court is in accord with this view, as shown by its having included the Rule 12(f) "for cause" exception from waiver. If "cause" is to have any meaning at all, it must include those cases where a motion prior to trial lacked any sufficient evidentiary basis and would have been futile. Defendant's failure to move to suppress prior to trial was thus "for cause shown", and defendant is relieved from the waiver provision of Rule 12(f) and will be allowed to proceed.

Having determined that defendant's motion to suppress is timely, the Court must consider whether the evidence seized at 417 Thieriot Avenue should be suppressed because the officers executing the search warrant failed to knock and announce their purpose.

■ Since the police officers chose to lie rather than admit that they did not knock and announce their purpose, they did not offer testimony of any exigent circumstances that would justify an unannounced entry into the Sanchez' apartment. While the evidence is clear that Tito Sanchez was aware that they were coming and was attempting to dispose of the evidence, the exigent circumstance doctrine is addressed to the good faith belief of the officers.

In *United States v. Boyer,* 574 F.2d 951 (8th Cir.), *cert. denied,* 439 U.S. 967, 99 S.Ct. 457, 58 L.Ed.2d 426 (1978), the Eighth Circuit stated, "The exceptions to the announcement of purpose by arresting officers depend on the officers' knowledge and belief." *Id.* at 954; *see United States v. Kulcsar,* 586 F.2d 1283, 1286 (8th Cir.1978) (affirming *Boyer* ); *see also* 2 LaFave, Search & Seizure 286–87 (2d ed. 1983) (some degree of belief necessary).[7]

■ The Second Circuit's relatively recent opinion in *United States v. Spinelli,* 848 F.2d 26 (2d Cir.1988), is in accord. There, the court, making explicit a "principle implicit in [ ] prior cases," stated that

> exigent circumstances may excuse noncompliance with the knock-and-announce requirement only where (1) the officers believe there is an emergency situation and (2) their belief is objectively reasonable. To excuse noncompliance either when the officers had no thoughts of emergency or when there was no reasonable basis for such thoughts would inappropriately compromise the privacy interest to be protected.

*Id.* at 29; *see Rivera v. United States,* 928 F.2d 592, 606 (2d Cir.1991) (affirming *Spinelli* ); *United States v. Stewart,* 867 F.2d 581, 584 (10th Cir.1989) (adopting *Spinelli* standard). Here, the police officers' testimony that they did knock and announce their purpose belies any claim that they had a good faith belief that exigent circumstances existed which would excuse a fail-

---

7. No position is taken as to what degree of belief the officers must have as to the subject's knowledge. *See* LaFave, *supra,* at 287 (discussing what degree required).

ure to knock and announce. Therefore, since the police officers failed to knock and announce their purpose before entering the second-floor apartment at 417 Thieriot Avenue, the evidence found during that search should be suppressed and a new trial ordered.

No doubt the police officers involved in this incident will view the results reached in this opinion as ludicrous and totally naive in second-guessing the on-the-spot decisions police officers are required to make in the difficult and often dangerous business of bringing narcotics traffickers to justice. Indeed, I am convinced that the police officers committed perjury here because they lacked confidence in the court's ability to reach a just result if the true facts were presented. Unfortunately, their lack of faith in the judicial process has deprived the Court of the appropriate record on which to judge the reasonableness of their conduct on the morning of January 9, 1991.

More important, however, those charged with enforcing our laws must act in full compliance with the Constitution and laws of the United States whether they agree with them or not. The balance between the need for efficient law enforcement and "The right of the people to be secure in their persons, houses, papers and· effects . . ." will not always be struck in a manner that will fully satisfy those "engaged in the often competitive enterprise of ferreting out crime." *Johnson v. United States,* 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948). But the protection of our constitutional liberties must rest on a more detached and studied judgment. As the Supreme Court observed in *Johnson:*

> The right of officers to thrust themselves into a home is also a grave concern, not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance. When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or Government enforcement agent.

*Id.*

The facts of this case present a good example of the competing interests that must be weighed in striking the constitutional balance between the legitimate concerns of the police and the Fourth Amendment rights of our citizens. On the morning of January 9, 1991 police officers made a shambles of the building that Police Officer Valdespino had purchased, in part as an investment and in part to be his home. They smashed in his doors, knocked a toilet off its base, and broke into an apartment for which they had no search warrant where they drilled into and destroyed a safe that Officer Valdespino had placed in that apartment so that he could safeguard the gun his job required him to possess. They left without making any repairs and with no notice to Officer Valdespino of what had occurred. This devastation was carried out in order to obtain, perhaps, some additional evidence against Tito Sanchez against whom the police already had enough evidence to procure a conviction.

No doubt the police officers involved believed in good faith that their actions were in society's best interests. Fortunately, our Constitution places that judgment in the courts and not the police. Law enforcement officers must learn to accept that fact and should never be permitted to think that the courts will allow them to avoid full compliance with the mandates of the Constitution by the simple expedient of lying about their actions.

As noted above, the Second Circuit has entered an order directing me to enter judgment on the jury's verdict. Thus, even though I believe a new trial should be ordered because of both the knowing use of perjured testimony and the illegal search and seizure at 417 Thieriot Avenue, I am compelled to deny defendant's motion and enter judgment. Carluin Sanchez is to be produced before me for sentencing on February 25, 1993 at 3:15 p.m.

SO ORDERED.